# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs November 8, 2000

## STATE OF TENNESSEE v. KEITH DALE THOMAS

### Appeal from the Circuit Court for Madison County
### No. 96-824    Roger A. Page, Judge

---

### No. W1999-01938-CCA-R3-CD - Filed February 6, 2001

---

The defendant appeals his conviction for first degree murder, contending that the evidence was insufficient to support his conviction. We affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

JOSEPH M. TIPTON, J., delivered the opinion of the court, in which DAVID H. WELLES and JAMES CURWOOD WITT, JR., JJ., joined.

Clifford K. McGown, Jr., Waverly, Tennessee, and George Morton Googe, District Public Defender (on appeal), and Leonard E. Van Eaton, Memphis, Tennessee (at trial), for the appellant, Keith Dale Thomas.

Paul G. Summers, Attorney General and Reporter; Mark E. Davidson, Assistant Attorney General; James G. Woodall, District Attorney General; and James W. Thompson, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

The defendant, Keith Dale Thomas, was convicted by a jury for first degree murder and possession of a deadly weapon with intent to employ it in the commission of an offense, a Class E felony, see Tenn. Code Ann. § 39-17-1307(c), and received consecutive sentences of life imprisonment and two years, respectively. In this appeal as of right, he contends that the evidence was insufficient to support his first degree murder conviction but does not contest the possession conviction. He argues that the state failed to connect him to the murder weapon, that the jury should have disregarded the testimony of Kevin Washington, and that he established an alibi.

At trial, the victim's sister, Vivian Taylor, testified as follows: On June 10, 1996, she was at the house of her mother, Tommi Lou Reeders, along with her sister, Donna Taylor. Between 6:30 p.m. and 7:00 p.m., Donna Taylor answered a telephone call from the defendant, who asked her to check on his wife, the victim. She called the defendant's house, and the defendant's five-year-old

son answered, but she could not understand him. Vivian Taylor took the telephone and asked the child to put his mother on the phone. He responded that she was on the floor dead. She told him to call 911, and then she, her mother, and her boyfriend, Rosco Lewis, drove to the defendant's house, which took about seven minutes. There were no cars at the defendant's house, but they saw the defendant's son and daughter looking out the window. They found the victim on the floor behind the front door. She checked to see if the victim, who was pregnant, was breathing. She then took the two children outside, and an ambulance and police arrived. Shortly thereafter, the defendant arrived and parked his Dodge Dynasty on the street behind the ambulance.

Tommi Lou Reeders, the victim's mother, testified as follows: On June 10, 1996, the defendant telephoned her house between 6:00 p.m. and 7:00 p.m. and asked if they had heard from his wife. The defendant had never before telephoned her to ask her to check on his wife. After the telephone call, she, Vivian Taylor, and Rosco Lewis drove to the defendant's house. The victim was lying inside the house behind the front door, and the children were in the living room. The police and then the defendant, who was driving a burgundy car, arrived shortly after they did. When the defendant arrived at the house, he "fell down on the ground and got up, fell down again and got up." After the ambulance left, Mr. Lewis drove the defendant in the defendant's car to the hospital and then returned the car to the defendant's house.

Donna Taylor, the victim's sister, testified as follows: On June 10, 1996, she was at her mother's house when the defendant telephoned and asked her to call his house to check on his wife, which is something the defendant had done before. When she called the defendant's house, the defendant's son answered. She asked him where his mother was, and he said that she was on the floor dead. She hung up the phone and asked Vivian Taylor, her sister, to call the defendant's house. The defendant's son told Vivian the same thing. At that point, Vivian, Ms. Reeders, and Mr. Lewis went to the defendant's house, and she telephoned the defendant, who had a cellular phone, and told him what his son had said. She did not know where the defendant was when she called him.

Sergeant Berkley Sane of the Jackson Police Department testified as follows: Approximately 7:30 p.m. on June 10, 1996, he was dispatched to the defendant's house and was the first officer on the scene. He went inside the house through the back door and saw the victim lying on the floor near the front door. Within minutes, an ambulance arrived, and EMS personnel performed CPR on the victim and then took her to the hospital. About thirty minutes after he arrived on the scene, the defendant arrived, driving a maroon Dodge Dynasty. He recalled seeing the defendant's car earlier in the day while on patrol in the area. The car had been parked at the intersection of Idlewild and Litton Street, which was about eight houses from the defendant's house. His patrol shift started at 3:30 p.m., and he saw the maroon Dodge Dynasty, which was the same kind and color of car that his wife drove, parked at that intersection at least four times before being dispatched at 7:30 p.m. He relayed this information to Officer Scandrett and asked him to check that intersection to see if a maroon Dynasty was still there.

Sergeant Sane also helped search the house for evidence and found a shotgun in plain view in the crawl space underneath the rear of the house. He also observed writing on the television, which read, "Mother f**ker, you're next Rev," and on the wall, "You know how I feel."

Officer Larry Scandrett, Jr. of the Jackson Police Department testified that he was at the scene and that Sergeant Sane asked him to go to the intersection of Litton Street and Idlewild to look for a burgundy Dodge Dynasty that he had seen parked there earlier in the day. He said that the Dynasty was not there but that a white Plymouth Neon was parked further down Litton Street near a dumpster.

Sergeant James Column of the Jackson Police Department testified as follows: On June 10, 1996, he was dispatched to the defendant's house. After the ambulance left with the victim, he looked for evidence. The house had been ransacked, and one of the doors looked as if it had been forced open. There was graffiti in a couple of places in the house, and some computer equipment and jewelry were in the back porch area of the house. He helped retrieve a pump model, 16-gauge Winchester shotgun from the crawl space in the back of the defendant's house. The shotgun had one spent shell casing, and another officer found a shotgun shell in the defendant's car. The shell was found in the car about forty-five minutes to an hour after he arrived, and the car was not moved from that time until it was towed to the police station. Further, he never saw the defendant leave the scene in the Dodge Dynasty.

Sergeant Belinda Wyatt of the Jackson Police Department testified as follows: On June 10, 1996, she was dispatched to the defendant's house and served as the crime scene technician. She helped retrieve a pump model, 16-gauge Winchester shotgun from the crawl space in the back of the defendant's house. She found seven shotgun pellets inside the house by the front door and a purse and keys on the couch near the front door. Several family photographs had been marked, including a photograph with an X over the victim's face and a dot on the defendant's forehead. The house was in disarray, and there were signs of forced entry through the back door. Also, computer equipment was near the back door.

Investigator Mike Turner of the Jackson Police Department testified as follows: On June 10, 1996, he assisted in collecting evidence from the defendant's house. He found a key in the victim's purse, and the key's tag was labeled "Enterprise Rent-a-Car" on one side and "Plymouth Neon white" on the other. This key started the white Neon that was recovered by police and towed to the police station. A live shell was found in the driver's seat of the defendant's car. He visually compared this shell to the spent shell recovered from the shotgun and noticed that the two shells were the same color, make, and type of load.

Sergeant Melinda Melton of the Jackson Police Department testified as follows: She was at the crime scene but remained outside the house. She saw the defendant arrive in a maroon Dodge Dynasty and park on the street in front of the house. The defendant commented to her that his wife's white Neon was not there and that his wife had the only key to the car. At some point, she looked into the defendant's car and saw, in plain view, a purple shell in the driver's seat. The car was seized

as evidence, and she followed the wrecker that towed the car to the police station. At the station, she looked inside the car again and noticed a key on the driver's side floorboard. She later tested this key in the white Neon, which had also been impounded, and the key unlocked the doors and trunk and started the ignition.

Elaine Taylor, a friend of the victim, testified as follows: On June 10, 1996, she and the victim finishing working at Sears at 6:00 p.m. She and the victim, who was driving a white rental car at the time, picked up their children from a day care center, and then the victim drove her home. The victim left her house around 6:20 p.m. and said that she was going home to make dinner. The victim's house was approximately a three-minute drive from her house. At 6:29 p.m., the defendant called her and asked if the victim was at her house. She responded that the victim had left and said that she was going home. The defendant then stated that he had told the victim to be home at 6:30 because he was going to call her. She told the defendant that the victim had been gone long enough that she should have been home. She said that the defendant had never called her house before to check on the victim.

Investigator Donna Turner of the Madison County Sheriff's Department testified as follows: She was the lead investigator in the defendant's case. Two keys to the white Neon were found – one from the victim's purse that was recovered from the house and one from the defendant's car. Both of these keys were tested on the Neon, and both started the ignition.

Investigator Turner saw the defendant at the crime scene and asked him to come to the police station to be interviewed, to which the defendant agreed. The defendant told her the following: He and the victim had been married for three and one-half years, and he was a pastor at the Denmark Christian Methodist Episcopal (CME) Church. He drove a maroon Dodge Dynasty, and the victim had been driving a rental car, a white Neon, at that time because her car had been in a wreck. He received several telephone calls the night before the murder from Gregory Miller in Atlanta, who had been the boyfriend of the victim's sister. The victim's sister had been killed in a car wreck in which Mr. Miller had been driving, and the victim's family had filed a wrongful death suit against him. Mr. Miller, who sounded drunk, said that the victim reminded him of the victim's deceased sister and that he wanted the victim to come to Atlanta to be his wife. The defendant said he dismissed this telephone call because he did not suspect his wife of having an affair with or any feelings for Mr. Miller.

The defendant last saw his wife on the day of the murder when he had lunch with her at Sears and last talked to her at 3:45 p.m. when he called her at Sears regarding their car insurance. He called Ms. Reeders' house at 6:30 p.m. because he was worried that he could not reach his wife at their house, although he said that his wife usually returned home from work between 6:30 p.m. and 6:45 p.m. When he telephoned his house, his son answered, said, "Mama's in the floor dead," and then hung up. He telephoned Ms. Reeders' house again and was told that Ms. Reeders and Donna Taylor were on the way to his house. He had left a church member's house around 7:00 p.m. and was in Haywood County when he made these telephone calls from his cellular phone. When he

arrived at his house, the police were there. He could not think of any reason why someone would kill the victim. He never owned a shotgun, and there were no weapons in the house.

Investigator Turner testified that the defendant was emotionless and never asked about his children. She stated that the defendant could not explain the presence of the shotgun shell or the key to the Neon, which were found in his car. Investigator Turner stated that the shotgun was untraceable because it was manufactured between 1946 and 1968, a period of time in which firearms dealers were not required to keep records of transactions. Investigator Turner testified that a telephone call made from the jail by the defendant to Anita Fouse on June 11, 1996, was recorded, which was the standard practice for all telephone calls made to or from the jail. During this conversation, the defendant stated that he did not have anyone who could put him in a certain location between 4:00 p.m. and 7:15 p.m. on June 10, 1996, and he asked Ms. Fouse to say that she was with him during that time.

Agent Robert Royce, a forensic scientist with the Tennessee Bureau of Investigation, testified as follows: With respect to the defendant's case, he received several items of evidence, including a shotgun which was found underneath the defendant's house, a shell case that was inside the shotgun, shot pellets found at the crime scene, shot pellets and a shot wadding recovered from the victim's body, and a live shell recovered from the defendant's Dodge Dynasty. The shotgun was a pump-action, 16-gauge Winchester and functioned normally, although he noted that the shotgun's barrel had been replaced with a barrel from a semiautomatic gas-operated shotgun. The shell found inside the shotgun was fired by that shotgun and matched the live shell recovered from the defendant's car. Also, the shot pellets recovered from the crime scene and from the victim's body, as well as the wadding recovered from the victim's body, were consistent with the spent shell casing.

Dr. Wendy Gunther of The University of Tennessee Medical Group Department of Pathology performed the autopsy on the victim. She testified that the victim had widespread destruction of her organs due to a shotgun wound to the back. She stated that the shotgun was fired from a distance "between contact and at most a few feet."

Anita Fouse testified as follows: She went to high school and college with the defendant. They did not keep in touch after college, but the defendant contacted her in December 1995 and sought a romantic relationship, telling her that he was divorced. She asked for proof of his divorce numerous times, but the defendant never provided it. Nevertheless, she had a relationship with the defendant. She worked at the Jackson Manor Nursing Home, which was a few blocks from the defendant's home, and she saw the defendant almost daily during her lunch hour. On one occasion when she telephoned the defendant's house, a woman answered, claiming to be the defendant's wife, and told her not to call there. When Ms. Fouse confronted the defendant about this, he said that the woman claiming to be his wife was lying. The defendant proposed marriage to her and gave her an engagement ring, and they scheduled their wedding for August 1996.

On June 10, 1996, Ms. Fouse stated that she went to lunch with the defendant at 11:30 a.m. They went shopping for some items for her patients, and the defendant dropped her off at the nursing

home around 1:15 p.m. At 3:45 p.m., the defendant telephoned her at work, saying that he was at home and would not be able to drive her home because he had to run some errands. She left work at 4:00 p.m., drove to her son's day care center, and then drove to her parents' house. About 5:00 p.m., the defendant telephoned her parents' house and asked what she was doing. She said she was getting something to eat, and the defendant said that he would call her back later. Around 5:45 p.m., the defendant telephoned and was screaming that he could not come see her today because he had received a phone call that the victim had been shot. The next contact she had with the defendant was the following morning when he telephoned her from jail. She asked the defendant why the newspaper article about the victim's death identified her as his wife, and he said that it was a misprint. He told her that he had not done anything but that he needed her to tell the police that he was with her visiting her mother at the nursing home. On cross-examination, Ms. Fouse denied going shopping at Cato's with the defendant on the day of the killing.

Tom Maupin, a security manager at BellSouth and the custodian of records, testified regarding outgoing telephone calls from the defendant's house on the day of the murder. He stated that Jackson Manor Nursing Home was called at 8:26 a.m., 1:32 p.m., and 3:38 p.m.; Sears was called at 4:01 p.m.; and Ms. Fouse's parents' house was called at 5:53 p.m.

Dexter Gabbard, a custodian of records for GTE Wireless, testified regarding telephone calls made from and received by a cellular telephone registered to the victim. He stated that cellular telephone calls are transmitted through a cellular tower. Most often the tower that is closest to the phone transmits the call, but if the phone is between two towers, then the tower that receives the signal better would transmit the call. Mr. Gabbard said that several telephone calls were made after 7:00 p.m. on June 10, 1996, including a call to Ms. Fouse's parents' house at 7:06 p.m., a call to Ms. Reeders' house also at 7:06 p.m., and a third call at 7:07 p.m. All three of these calls were transmitted through towers in Madison County. The next call was an incoming call which was received at 7:29 p.m. and transmitted through a tower in Haywood County. Several other calls were made between 7:30 p.m. and 7:33 p.m. and transmitted through a Haywood County tower. Finally, several calls made and received after 7:57 p.m. were transmitted through towers in Madison County.

Kevin Washington, an inmate in the Chester County jail, testified as follows: He had been convicted for forgery and theft of property valued over $10,000. He met the defendant before he was in jail at the Old Hickory Mall, where he regularly sold and traded clothes. On one occasion, he traded some clothes and shoes to the defendant. The defendant asked him if he had any guns for sale, to which he responded that he had two shotguns. The defendant then followed him to his house and took the two shotguns, clothes, and shoes in exchange for twenty-six blank checks.

Mr. Washington next spoke to the defendant in the Madison County jail when they were both incarcerated. The defendant asked him if he had told anybody about the guns, and he said that he had not. He asked the defendant why he was in jail, and the defendant stated that he was charged with killing his wife. He and the defendant were transferred to a Mason, Tennessee facility, and they slept two beds apart. While they were outside one day, he asked the defendant why he had talked to him about the guns, and the defendant responded that it was because they "were going along with

the program." When he asked the defendant what he meant by this, the defendant said that one of the guns was the gun that he was accused of using to shoot his wife. Later in the conversation, he asked the defendant why he killed his wife, and the defendant said that he "committed the perfect crime and got away with it." The defendant then told him the following about how he committed the murder: He parked at a place called Camp's, walked to his house the back way, and kicked in the back door. He then moved some computer equipment to the back of the house to make it look like a burglary. His wife came into the house while he was moving the equipment and saw him. His wife went outside to get the children, and when she came back inside, he shot her. When he left the house, he left the gun in the backyard.

Mr. Washington said that the defendant also told him that he was trying to obtain information about a check that his girlfriend had written on the day of the murder so he could use it for an alibi by saying that he was with her at a certain time on that date. The defendant told him that he had been in a store with his girlfriend and his girlfriend's child on a day before the murder but not on the day of the murder. Mr. Washington testified that if the written statement that he gave to the police stated that he traded the defendant two single shot shotguns, then he made a mistake because he traded the defendant two pump shotguns.

Barbara Perry, a sales associate at Cato's department store, testified that she recognized the defendant and that she remembered that he, a woman whose name she thought was Andrea Fouse, and a little boy were in Cato's on "a Monday night a little before we closed" at 7:00 p.m., although she could not remember the exact date. She said that she was asked to identify the defendant and shown a newspaper article with the defendant's photograph within that same week. She admitted that she did not read the article and did not know the date of the newspaper.

Kenneth Thomas, the defendant's brother, testified that he was not aware of any problems between the defendant and the victim. Rosie Thomas, the defendant's mother, also testified that she was not aware of any problems between the defendant and the victim but stated that she learned that the defendant was engaged to Anita Fouse on the day of the murder.

Gladys Thomas, the defendant's sister, testified that she knew of no problems between the defendant and the victim. She said that she had never seen a gun at the defendant's house and never knew the defendant to have one. She stated that on the night of the murder, she saw the defendant leave the crime scene in his car but that "one of the sister's boyfriends" was driving. She admitted that she had seen the defendant with a woman about two months before the murder and suspected that he was having an affair.

The Reverend Dr. James E. Brown testified that he was a district supervisor in the CME Church and had appointed the defendant to a position of a pastor. He said that the defendant was a role model for other young ministers and that he knew of no problems between the defendant and the victim. He stated that if a minister in the CME Church asked permission to get a divorce because he was engaged to another woman with whom he was having an affair, then he would lose his position as a minister in the church.

Anita Fouse was recalled by the state as a rebuttal witness. She testified that she did not go to Cato's with the defendant on June 10, 1996, but that she had been at Cato's about two weeks before that date. She further stated that she was not with the defendant at any time during the afternoon or evening of June 10, 1996.

Upon the foregoing evidence, the jury convicted the defendant for first degree murder and possession of a deadly weapon with intent to employ it in the commission of an offense. The defendant contends that the evidence was insufficient to support his first degree murder conviction, arguing (1) that the state failed to connect him to the murder weapon because Mr. Washington was not asked to identify the shotgun recovered from underneath the defendant's house, (2) that the jury should have disregarded Mr. Washington's testimony because his written statement was inconsistent with his testimony at trial with respect to the type of shotgun he traded the defendant, and (3) that he established an alibi through Ms. Perry's testimony. The state contends that the evidence is sufficient. We agree.

Our standard of review when the sufficiency of the evidence is questioned on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979). This means that we do not reweigh the evidence but presume that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the state. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions about witness credibility were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).

The evidence viewed in the light most favorable to the state reveals that the defendant made a trade with Mr. Washington to obtain two pump shotguns. A pump shotgun was found underneath the defendant's house and was determined to have been the murder weapon. Shot pellets that were recovered from the scene and from the victim's body were consistent with the spent shell found in the shotgun and a live shell found in the driver's seat of the defendant's car. Also, the defendant admitted to Mr. Washington that he shot his wife. Finally, the evidence reveals through Ms. Fouse's testimony that the defendant was not with Ms. Fouse at Cato's on the evening of the murder. We conclude that the evidence is sufficient to support the defendant's conviction for first degree murder.

Based upon the foregoing and the record as a whole, we affirm the judgment of the trial court.

_____
JOSEPH M. TIPTON, JUDGE